GEORGE H. BURT & another *vs.* NATHANIEL F. TUCKER.

Suffolk.   March 12, 1901. — April 4, 1901.

Present: HOLMES, C. J., LATHROP, BARKER, HAMMOND, & LORING, JJ.

*Semble,* that the right to use a word as a trade-mark does not depend on originality even as against the originator of the peculiar use. Per HOLMES, C. J.

A manufacturer of shoes in Massachusetts adopted a label with the word "Knickerbocker" as a general mark for his goods or a large variety of them, although he also used other marks for goods made to order for particular firms. Two years later his factory was burned, and he went out of business and for four years was in the employ of others as a salesman in other States. At the end of that time he resumed business for himself in Philadelphia selling the goods of a New Jersey company as a jobber, adopted the title "Knickerbocker Shoe Company" and used the word "Knickerbocker" on his packages with a label similar to the one he formerly used. He testified that he never had intended to abandon the use of the word "Knickerbocker" as a trade-mark regarding it as a valuable possession and that he resumed it at the first opportunity. During the four years that this former manufacturer was working for others, the word "Knickerbocker" had been adopted as a trade-mark by another manufacturer of shoes. In a suit brought by the last named manufacturer against the first named for alleged infringement of his trade-mark, it was *held,* that the judge who tried the case was warranted in finding, that the defendant had made the word "Knickerbocker" a trade-mark, that he had not abandoned it, and that his present use of it was within the scope of his original acquisition.

BILL IN EQUITY by copartners engaged in the manufacture and sale of boots and shoes, to restrain the defendant from using their trade-mark consisting of the word "Knickerbocker" as applied to boots and shoes, filed November 27, 1900.

The case was heard in the Superior Court, by *Mason,* C. J., who made the following note on the papers in the case: "The answer admitting so much of the plaintiffs' case as to rely wholly on the matter alleged in avoidance, the defendant was directed by the court to go forward on the question of the prior ownership and abandonment."

Thereafter on December 12, 1900, the judge indorsed and signed on the back of the bill the following: "The pleadings admit many of the allegations of the plaintiffs' bill. Upon the matters which the pleadings leave in issue, the court finds the facts to be as stated in the defendant's answer, and directs a decree dismissing the bill with costs."

On the same day there was entered the following decree: "This cause came on to be further heard at this sitting on the pleadings and the evidence submitted by each party, and was argued by counsel, and thereupon, on consideration thereof, it is ordered, adjudged and decreed that the bill be dismissed with costs to be taxed by the clerk, and that execution issue therefor." From this decree the plaintiffs appealed.

The answer so far as it contained statements of fact was as follows:

"This defendant . . . admits that the plaintiffs have for some time past been engaged in the business of the sale of boots and shoes at retail, which shoes they have designated by the word 'Knickerbocker'; and further admits for the purposes of this suit that they have used a trade-mark, an essential feature of which is the word 'Knickerbocker,' substantially as stated in the plaintiffs' bill; and further admits, . . . that the plaintiffs have built up a substantial business in such sale of boots and shoes designated by the word 'Knickerbocker.' . . .

"The defendant denies that he has used the word 'Knickerbocker' in connection with his business for the purpose of falsely representing the boots and shoes sold by him to have been manufactured by, and to be the same kind, character and quality as those manufactured and sold by the plaintiffs, and further denies that he has, as in the plaintiffs' bill alleged, or otherwise, fraudulently undertaken to engage in the sale of boots and shoes with a purpose of depriving the plaintiffs of such legal rights, if any, as they may have to the use of the word 'Knickerbocker,' or any design or other designation which they may have used in connection with their business; and the defendant further denies that the trade-mark which has been used by the plaintiffs is valid or of any value, or that it entitles the plaintiffs to the use of the word 'Knickerbocker' in any form as against the defendant, for reasons stated hereafter in the defendant's answer.

"Further answering, this defendant says that in the year 1896, and for several years prior thereto, he was engaged in the manufacture of boots and shoes for misses' and women's wear under the name and style of N. F. Tucker & Co., in the city of Lynn, Massachusetts, and in the town of Middleton, Massachusetts, and for the purpose of advertising goods of his manufacture and in-

creasing the sale thereof, he, about the year 1894, caused to be made certain designs to be placed on his cartons or pasteboard boxes containing shoes of his manufacture, which said designs distinguished the shoes made by him as 'Knickerbocker' shoes, and included a sketch or design representing what was said to be the Knickerbocker arms or emblem together with the word 'Knickerbocker'; that after procuring said designs he caused to be printed therefrom labels for such cartons or pasteboard boxes in large numbers, and during said years sold to the trade in various parts of the country shoes put up in such boxes and so designated by labels, and that such label, including such design and the word 'Knickerbocker,' as aforesaid, was generally used by him during all of said years in connection with his said business of the manufacture and sale at wholesale of boots and shoes; that in the year 1896 he ceased to manufacture boots and shoes, and since said year has not, until about July or August of the present year, been engaged in the business of the manufacture and sale of boots and shoes on his own account, but has been employed by sundry manufacturers as a salesman; that in July or August of the present year he decided to engage in the jobbing of boots and shoes in Philadelphia, Pennsylvania, and purchased from certain manufacturers boots and shoes to constitute his stock in trade for such jobbing business, and upon receiving shoes so purchased by him he caused the same to be labelled on the cartons or paper boxes, on the ends thereof, with labels bearing the same design as that used by him in 1896, and previously as aforesaid, said labels so used by him in the present year being identical in design with those previously used, the only difference being that the labels previously used were printed in colors, while the style for such labels having changed, those used in the present year have been printed in plain black, and are smaller in size than those formerly used; that when he caused said design to be made and said labels to be printed, and used them as aforesaid in 1896, and prior thereto, he intended to, and did, adopt said design and labels as a trade-mark for his exclusive use in designating and distinguishing boots and shoes of his manufacture; that said design and label so adopted were used by him generally and regularly in his business until he discontinued business in 1896, and this adoption and regular use took place

long before the word 'Knickerbocker' was used by the plaintiffs in their business; that when he discontinued business in 1896 he did not intend to abandon said design and labels, or his right to the same, and did not use them from 1896 to July or August, 1900, because he was out of business, as aforesaid, and that immediately upon resuming business he resumed the use of said design and labels."

In addition to the facts stated in the answer the record set forth oral testimony of the defendant and other witnesses. The defendant in the course of his testimony was asked the following questions to which he gave the following answers:

"*Q.* Whether or not you continued to use that label [with the word 'Knickerbocker'] until you discontinued business, until the fire? *A.* Yes, sir. — *Q.* How generally did you use it? *A.* Well, we used it very largely in the jobbing trade in New York, and to our general retail trade through the West, through the Middle States and the West."

"*Q.* Now you say from July, 1896, to until July, perhaps, or August, 1900, you were not in business for yourself? *A.* No. — *Q.* And you opened business in Philadelphia in August, 1900? *A.* Yes, sir. — *Q.* And you then purchased shoes of whom for your business? *A.* The Newton Shoe Co. — *Q.* And did you open a store in Philadelphia? *A.* I did. — *Q.* Did you put up any sign? *A.* Yes, sir. — *Q.* What sign? *A.* Knickerbocker Shoe Co. — *Q.* And were any of the shoes as you received them from the Newton Shoe Co. labelled in any way or designated? *A.* They were not. I labelled them after I received them."

"*Q.* Now, come back to the Philadelphia business. Will you state whether or not, when you discontinued business in 1896, you abandoned or gave up the intention to use the label which you had used up to that time, this label which you exhibited? (*Objected to, admitted.*) *A.* No, it had become altogether too valuable a trade-mark for me to abandon, and I resumed it at the first opportunity. — *Q.* Will you now state why, from July, 1896, to July, 1900, you did not use it? *A.* I was out of business and unable to use it."

"*Q.* I will ask you this other question which was objected to, whether between July, 1896, and your resumption of business, when you used the labels which you used this year, you at any

time abandoned or in any way abandoned the use of that label?
A. No, sir; I held it as a valuable possession."

On cross-examination the defendant was asked among others
the following questions which he answered as follows:

" Q. How many different kinds of lasts were there? A. Five
or six different ones; I don't recollect. The name 'Knicker-
bocker' did n't describe any distinctive style of shoe. We made
a wide range of shoes under the general name of the Knicker-
bocker shoes."

" Q. And you used, I suppose,. Mr. Tucker, a number of
trade-marks, did n't you? You would call them trade-marks?
A. Yes. — Q. You designate them by different names at differ-
ent times? A. Yes, sir. — Q. How many names do you recall
that you used in making and sending out and selling your shoes?
A. One of our leading lines was the Excelsior line, the line
which I am using to-day, Excelsior shoes. I am using the same
to-day. The other was the 'Knickerbocker' which I am also
using to-day. There was one special one made for Winch Broth-
ers, 'Little Drummer.' That is all that survived. Whether
there were any others I am not entirely sure."

" Q. Do you recall the Continental? Did n't you use the Con-
tinental? A. Yes, sir. Made lots of those for Lamkin & Foster.
— Q. A lot you marked 'Continental'? A. Yes, sir. — Q. How
about Argyle? A. Made those for Clark & Hutchinson. —
Q. You made some marked 'Argyle'? A. Yes. — Q. How about
Ashley? A. I never used the term to the best of my knowledge
and belief, never did. — Q. Gascogne? A. I am not sure about
that. — Q. Viscol? A. I am not sure about that. It was the
custom of dealers then to prescribe labels for goods. I don't
know whether they did or not."

" Q. How did you get the word 'Knickerbocker School Shoe'?
A. I went to the Boston Bank Note Company and told them I
wanted a design. At that time Batchelder & Lincoln were run-
ning heavily on our Excelsior line of goods and they wished us
to confine the use of that label to them, so I was obliged to seek
another general label for my trade, and I thought that the
Knickerbocker — it occurred to me it was a pretty good name.
I went to the Boston Bank Note Company and asked them what
shape they could put that into. I wanted it especially adapted

to any New York trade. I thought it was a good name for the New York. They brought me a design, saying to me this was the old Knickerbocker arms, and they brought in the design practically as adopted. I thought it was a good thing and I adopted it and paid them for it."

" *Q.* Now when parties would write to you and order shoes they would ask you to put on those shoes certain names, and among them would be the name 'Knickerbocker'? *A.* I don't know that anybody ever did. I think not. I pushed my own goods and pushed the name. I was anxious to have that name used. — *Q.* Those goods were also marked other names, were they not? *A.* What goods do you refer to? — *Q.* What you call the Knickerbocker School Shoe. *A.* There was no distinctive Knickerbocker shoe."

" *Q.* Now, Mr. Tucker, you gave up business entirely along about the middle of 1896? *A.* On account of the burning of the factory. — *Q.* The factory burned and you went out of business entirely? *A.* Yes, sir. . . . — *Q.* And then what did you do? *A.* I went to selling goods for various parties on commission until I could get things in position to begin business again on my own account. — *Q.* You have been engaged as a salesman for the last two years, have you, for the Newton Shoe Company, Newton, N. J.? *A.* Yes. — *Q.* Why did you make a search and examination of the records to find if the name 'Knickerbocker' had been used by any other party if you were entitled to the use of it? *A.* Because I was going — I thought I saw an opening to sell two lines of goods at a certain price, of a certain kind. I gave these two lines of goods my old trade-marks, 'Excelsior' and 'Knickerbocker,' knowing that they would be valuable to me, because I was very well and favorably known in the trade by goods which I had manufactured under those names I adopted. My first arrangement I thought I would call myself the Excelsior Shoe Co., as the Excelsior was the highest price shoe I was going to put out, but I found before I got far in it, that there was a concern, an Excelsior Shoe Company, doing business in Portsmouth, Ohio, which, of course, precluded the use of the term. Then I made a thorough search, as far as I was able, to find whether anybody was doing business under the style of the Knickerbocker Shoe Co. I was told there was a concern

in Baltimore who had been doing business under the name of the
Knickerbocker Shoe Co. I made considerable effort to find them,
but they were not in existence, and I found they were not in ex-
istence then at the present time, and so I adopted that name as
the name under which to do business."

"Q. Did n't you know that in Lynn there was a factory man-
ufacturing Knickerbocker shoes? A. No, sir; not until after I
had my printing out."

A. P. Browne & N. F. Hesseltine, for the plaintiffs, contended,
that the use of the word "Knickerbocker" by the defendant be-
fore the plaintiffs adopted it was not as a trade-mark but merely
as an advertising device, and that, if the defendant had a trade-
mark, he used it only in the business of manufacturing shoes, and
that when his factory was burned in 1896 he went out of that
business and never resumed it, and that in 1900 when he became
a jobber to sell shoes his old trade-mark had been abandoned,
and, even if it was not abandoned, he had never acquired the
right to use it in selling as a jobber shoes manufactured by
others.

S. L. Whipple & G. F. Bean, for the defendant.

HOLMES, C. J. This is a bill to restrain the infringement of
an alleged trade-mark consisting of the word "Knickerbocker,"
as applied to boots and shoes. In the answer a prior use and
acquisition of the trade-mark by the defendant is set up. The
case is here on the evidence, by appeal from a decree of the Su-
perior Court dismissing the bill, after a finding that the facts
were as alleged in the answer.

In considering whether the defence is made out, of course we
shall assume in favor of the finding that the defendant was an
honest witness, as he had every appearance of being, so far as
the printed answers go. It was admitted in the argument before
us that the defendant was the first to use the word. It would
have to be admitted also that when he resumed the use he did so
in ignorance of what the plaintiffs had done in the meantime, so
that in its dramatic aspect the case for the defendant is pretty
strong. The plaintiffs, however, deny that the defendant ever
did more than to use the word as an advertising device, and in-
sist that if he did get a trade-mark it was abandoned as matter
of fact and of law, and further that the defendant now is making

a use of the word not within the scope of any right which he may have acquired.

We assume in favor of the plaintiffs that they might be entitled to prevail notwithstanding the fact that the defendant first used the word in its present connection, and that the right to a trade-mark does not depend upon originality, even as against the originator of the characteristic use. *Menendez* v. *Holt*, 128 U. S. 514, 521. *Royal Baking Powder Co.* v. *Raymond*, 70 Fed. Rep. 376. We therefore assume that the points toward which the plaintiffs have directed their argument are the points necessary to be considered, and that what we have called the dramatic aspect of the facts is not conclusive of the equities upon which the decision of the case must turn.

In the first place then it is to be considered whether the defendant ever had a trade-mark. Upon this question the finding of the Superior Court seems to us fully warranted by the evidence. From 1894 to 1896 the defendant used the mark, very largely, as he says, in the jobbing trade in New York and in the general retail trade, especially through the middle states and the west. He used it not to designate a particular style of shoe, but to cover a wide range of shoes which he manufactured and sold. It is true that he also used other names, but most of them were used for the special goods of particular houses only, and one which was started for general use, " Excelsior," became appropriated to a single firm. Without intimating that a man could not have more than one trade-mark for his boots and shoes, we are of opinion that the judge was warranted in finding that by the course of the defendant's business " Knickerbocker " became his general mark for his goods, or for a large variety of them.

There is more difficulty on the question of abandonment, but in view of the testimony of the defendant we are not prepared to say that the finding of the Superior Court was wrong. If we should adopt the plaintiffs' contention that the defendant's intent is immaterial, then the question would be whether, from lapse of time, or the public abandonment of his business, or from other causes, the good will associated with the name had melted away, either gradually or at once. In July, 1896, the defendant's factory in Massachusetts was burned and he went out of busi-

ness. From that time until July or August, 1900, he worked for others as a salesman in other States. During those four years of course he made no use of his trade-mark. Then he began business again on his own account in Philadelphia, selling goods of a New Jersey company as a jobber, and then he resumed the use of the name on his packages, adopting it as a title for his concern, " Knickerbocker Shoe Company." Certainly it is hard to believe that a name which had not been more or longer associated with the defendant's goods than this had been still should have value from any good will once attached to it. But the defendant testified, at least by implication, that it did, and the extent to which his testimony should carry credence is a matter on which we cannot undertake to revise the opinion of the judge who saw him. *Royal Baking Powder Co.* v. *Raymond,* 70 Fed. Rep. 376, 380. *Mouson* v. *Boehm,* 26 Ch. D. 398. *Julian* v. *Hoosier Drill Co.* 78 Ind. 408, 412. Browne, Trade-marks, § 680.

It may be argued that there is another aspect of the facts just stated, also irrespective of intent. It may be contended that discontinuing the use of the trade-mark, at least when coupled with abandonment of the business, amounts to a notification of the public that any one is free to use the mark, and that the defendant cannot go behind the import of his acts after the plaintiffs have taken up the use, although the old good will still attaches to the name, whatever the private intent of the defendant may have been. But it is plain that there is no such meaning absolutely attached to a discontinuance of use, and it seems to us that even when the business also is discontinued, it is not a necessary conclusion that the use of the mark at once is free to all. Or, at least, to put it more cautiously, whatever rights may have been gained by the plaintiffs if they used the mark in good faith in the interval of discontinuance, the defendant still may be entitled as against them to resume his use. *Mouson* v. *Boehm,* 26 Ch. D. 398, 407, 408. *Levy* v. *Waitt,* 61 Fed. Rep. 1008. *Julian* v. *Hoosier Drill Co.* 78 Ind. 408, 412.

In the cases and text-books intent is assumed to be important. Browne, Trade-marks, § 681. Perhaps it might be so as giving a character to the ambiguous fact of discontinuing the use of the mark. Perhaps if the use were given up with the intent never to resume it, that would amount to an offer of it to the public

which any one might accept at once, although giving up the use with intent to resume would not have that effect. If this should be so, and if a trade-mark may be lost under such circumstances before the vanishing of the good will associated with it, here again it is something of a stretch to believe that the defendant, during the four years that he was a salesman, continuously intended to resume business on his own account and again to use the name. But it is perfectly possible, he says that he did, and the Superior Court has found accordingly, and in this matter also we have no sufficient ground for going behind its view of the facts.

Finally, the plaintiffs argue that the defendant is attempting to make his old trade-mark cover a new meaning, as well as to change its form. It was used on shoes manufactured by him in Massachusetts, and seems in fact to have been confined mainly to shoes for young people, in connection with the word " School " (" Knickerbocker School Shoes "). It now is used upon shoes made by another firm in New Jersey and sold by him in Philadelphia. It is pointed out also that he has taken his word into his business and dropped " School " altogether. Again we have to fall back on the findings. We cannot say that the judge was not warranted in finding that the word originally indicated the source from which the shoe was recommended, rather than that of its manufacture, — a judgment of excellence which more or less commends itself to buyers. If so, it might be found that the present case is like the former in its characteristic features, and if that were found and it were established that the defendant could use the trade-mark on the shoes which he intended to sell, we see no ground on which the plaintiffs could prevent his incorporating the same word into his business name.

It will be seen that we nowhere undertake to say what our decision would have been on the printed evidence had it come before us in the first instance. We confine ourselves according to the settled practice to considering whether we can say that the judge who saw the witnesses necessarily was wrong upon matters which depended very largely on the degree to which they were believed.

*Bill dismissed.*